UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| AARON FREEMAN,<br><br>                        Plaintiff,<br><br>          v.<br><br>TREVOR JACOBSON and<br>JORDAN USDIN,<br><br>                        Defendants. | **Case No. 20-CV-10040**<br><br>**ECF Case**<br><br>**COMPLAINT** |

COMES NOW THE PLAINTIFF, Aaron Freeman, by his attorney, Steven M. Warshawsky, for his Complaint against the defendants, Trevor Jacobson and Jordan Usdin, and alleging upon personal knowledge and upon information and belief as follows:

## PARTIES

1. Plaintiff Aaron Freeman is an adult person who resides in Toluca Lake, California. For purposes of this action, he is a citizen of California.

2. Defendant Trevor Jacobson is an adult person who resides in New York, New York. For purposes of this action, he is a citizen of New York.

3. Defendant Jordan Usdin is an adult person who resides in New York, New York. For purposes of this action, he is a citizen of New York.

## JURISDICTION AND VENUE

4. This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity), because this is a civil action between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

5. This Court has venue over this action pursuant to 28 U.S.C. § 1391(b)(1), because all defendants reside in this district, and § 1391(b)(2), because a substantial part of

-1-

the events or omissions giving rise to the claim occurred and a substantial part of property that is the subject of the action is situated in this district.

6. The statutes of limitations applicable to the plaintiff's claims arising under New York law were tolled continuously from March 20, 2020, to November 3, 2020, pursuant to New York State Executive Orders 202.8 through 202.67.

## FACTUAL ALLEGATIONS

### A. The Parties' Relationships

7. Plaintiff Aaron Freeman and Defendant Trevor Jacobson were in a personal romantic relationship from approximately August 2002 to December 2015. At times relevant to this case, they were living together in an apartment located in Hanover Square in New York, New York.

8. Freeman and Jacobson broke up in or about December 2015. Their break up was mutual and amicable. In or about January 2016, Jacobson moved out of their apartment and into an apartment located on 23rd Street in New York, New York.

9. Defendant Jordan Usdin is Jacobson's current boyfriend.

10. Upon information and belief, Jacobson and Usdin became involved in a personal romantic relationship in or about late 2016.

11. Upon information and belief, Jacobson and Usdin live together in an apartment located on Reade Street in New York, New York.

12. During the summer of 2018, Freeman started contemplating relocating out of New York City, where he had lived for approximately 17 years, either to Europe or to the West Coast. Ultimately, in or about February 2019, Freeman moved to Toluca Lake, California, which is a neighborhood in Los Angeles, where he resides in an apartment located on Woodbridge Street.

### B.     The Match Group Stock Purchase

13.    In or about October 2015, when Freeman and Jacobson still were a couple and living together, Jacobson was offered an opportunity through his employer to purchase shares of stock in Match Group, Inc. (MTCH).

14.    Jacobson's employer at that time was The Daily Beast, which was owned by IAC (www.iac.com), a media and entertainment conglomerate headquartered in New York City.  IAC was spinning off the Match Group and offered its employees across brands the opportunity to purchase shares at the IPO price of $12 per share.

15.    Jacobson proposed to Freeman that they invest 50/50 in any shares that Jacobson would be allotted.  Freeman agreed.  Freeman and Jacobson's mutual financial advisor was privy to this arrangement.

16.    In or about November 2015, Jacobson was authorized to purchase 300 shares, for a total cost of $3600.  Freeman contributed $1800 towards this purchase, which funds were received and accepted by Jacobson.

17.    The shares were purchased by Jacobson in his name and placed in a J.P. Morgan account that had been set up by his employer for the Match Group Inc. Directed Share Program.  At the time, Freeman and Jacobson agreed to hold the shares in the J.P. Morgan account and let them appreciate.

18.    Freeman reasonably relied upon Jacobson's representations and promises that half of the shares, which were paid for with Freeman's money, belonged to Freeman and would be provided to him upon request in the future.

19.    After Freeman and Jacobson broke up, they agreed to continue holding the shares in the J.P. Morgan account and let them appreciate.

20. At all times relevant to this case, Jacobson, through words and deeds, acknowledged Freeman's rights to half (150) of the shares.

21. In or about July 2018, Freeman asked Jacobson to transfer the 150 shares to him personally. Freeman asked again in or about December 2018. At no time did Jacobson dispute that the 150 shares belonged to Freeman. On the contrary, Jacobson agreed to Freeman's request and represented that he would arrange for the shares to be transferred to him, once a suitable financial transaction could be arranged.

22. In or about June 2019, Jacobson informed Freeman that he was going to transfer the shares from the J.P. Morgan account to his personal Charles Schwab account, as the first step to gifting them to Freeman. At this time, Freeman and Jacobson once again discussed and agreed that the 150 shares paid for and owned by Freeman would be transferred by Jacobson to Freeman. They planned to employ their mutual financial advisor to arrange the stock transfer.

23. On multiple occasions after June 2019, Freeman inquired with Jacobson about the 150 shares and when they will be transferred to Freeman. Jacobson has ignored his inquiries. In or about January 2020, Jacobson told a mutual friend that Freeman would have to sue him if he wanted his 150 shares.

24. To date, Jacobson has failed and refused to transfer to Freeman the 150 shares of Match Group stock paid for and owned by Freeman, despite demand by Freeman that the shares be transferred to him.

25. Jacobson's failure and refusal to transfer to Freeman the 150 shares of Match Group stock paid for and owned by Freeman is willful and malicious and demonstrates a high degree of moral culpability.

26. Jacobson's failure and refusal to transfer to Freeman the 150 shares of Match Group stock paid for and owned by Freeman has caused Freeman financial damages and emotional distress.

27. Upon information and belief, these shares of stock are worth approximately $20,000.

### C. The Dog Saylor (aka Sailor)

28. In or about March 2010, when Freeman and Jacobson still were a couple and living together, Freeman went to the Animal Haven dog shelter in New York City and adopted his dog Saylor (aka Sailor – the original registered spelling of his name). Saylor is a male mixed breed dog, born in January 2010, approximately 45 pounds, and predominantly tan or yellow in color. The adoption paperwork listed Freeman as Saylor's new owner.

29. Since March 2010, Freeman has been and remains Saylor's owner as registered with the New York City Department of Health and Mental Hygiene (under the name Sailor). Freeman has paid all license fees for Saylor.

30. Freeman is Saylor's owner as listed on Saylor's microchip registration (under the name Sailor).

31. From March 2010 through January 2016, when Jacobson moved out of their apartment, Freeman was Saylor's primary caretaker. Freeman was responsible for caring for Saylor through a severe bout of separation anxiety as a puppy. Freeman handled Saylor's feeding, walking, training, dog sitting, doggy day care, and veterinary care (routine and emergency). Freeman took Saylor on walks, to parks, and on trips. Freeman paid for all of Saylor's expenses.

32. Over the years, Freeman and Saylor developed a very close and loving human-pet relationship, which has been witnessed and acknowledged by Jacobson. Freeman considers Saylor his emotional support animal.

33. When Jacobson moved out of their apartment in or about January 2016, Freeman agreed to share custody of Saylor with Jacobson. At that time, they agreed that Saylor would spend approximately half the time with Jacobson, who would pay for Saylor's daily needs while the dog was living with him and half of Saylor's doggy day care and veterinary expenses. Freeman and Jacobson usually alternated one- and two-week periods with the dog. This arrangement worked smoothly and amicably until in or about May 2019.

34. On or about December 17, 2018, when Freeman was planning to move outside of New York City (which had been discussed with Jacobson starting in the fall), he dropped off Saylor at Jacobson's apartment and asked Jacobson to take care of Saylor while Freeman completed his relocation, at which time Freeman intended to retrieve Saylor and take him to his new home. This was a very emotional conversation for Freeman, who never had been away from Saylor for such a long period of time. Jacobson agreed. It was expressly discussed and understood between them that once Freeman relocated, Jacobson would return Saylor to him. They did not discuss, and Freeman never agreed, that Saylor would remain permanently with Jacobson in New York City after Freeman had moved. Rather, for 2019 they agreed to share custody of the dog for six months each (six months with Jacobson followed by six months with Freeman) and then discuss arrangements for 2020 at the end of the year.

35. In or about April and May 2019, after he had settled into his new life in Los Angeles, Freeman started texting Jacobson about possible dates to pick up Saylor and bring him to California. Jacobson did not respond to these text messages.

-7-

36. On or about May 20, 2019, Freeman and Jacobson spoke by telephone. When the conversation turned to Saylor and Freeman's plans to take him on a cross-country car trip from New York City to Los Angeles, Jacobson flatly stated (in sum and substance): "I am not going to give you Saylor back. I am keeping him and no longer going to share him with you." This was a mental and emotional blow to Freeman, who protested that Saylor belonged to Freeman and Jacobson had no right to keep him. Jacobson was obstinate and refused to return the dog to Freeman.

37. Following their May telephone conversation, desperate to have his dog back, Freeman continued to reach out to Jacobson (via texts and emails) about his plans to bring Saylor to Los Angeles. Jacobson eventually acquiesced to Freeman's plans to pick up Saylor in September and fly him to Los Angeles on Jet Blue in a Mint class private suite.

38. On or about June 22, 2019, Freeman was in New York City and met with Jacobson at his apartment on Reade Street, when they had a 30-45 minute conversation about Saylor. During this conversation, Jacobson acknowledged that Saylor belonged to Freeman and confirmed that Freeman would be picking up Saylor in the fall to bring to his home.

39. Once again, Jacobson reneged on their agreement. On or about September 17, 2019, after ignoring several of Freeman's texts and emails concerning his plans for picking up Saylor, Jacobson called Freeman and told him that he was not going to give Saylor back and would not allow Freeman to take the dog to California. To prevent Freeman from taking the dog, Jacobson threatened to hide Saylor at an unknown location in New Jersey (upon information and belief, where Defendant Usdin's family lives).

40. Upon information and belief, Defendant Usdin was privy to Jacobson's discussions with Freeman about Saylor and aided and abetted Jacobson's plans to keep Saylor from Freeman.

41. Although mentally and emotionally distraught by Jacobson's intransigence and dishonesty, Freeman continued to seek an amicable resolution of the situation. He emailed Jacobson on or about September 20, 2019, once again offering to share custody of Saylor and proposing a written "Agreement" memorializing such an arrangement. Jacobson did not and has never agreed to such an arrangement.

42. On September 24, 2019, Jacobson emailed Freeman setting forth his position regarding Saylor:

> *I've spent the last couple days thinking about things and ultimately believe that if Saylor goes to LA it needs to be a once in a lifetime thing for him. We can't put him through the stress and disorientation that comes with moving him back-and-forth.*
>
> *I'm just not prepared to make that plan yet. We've gotten into a well balanced routine, he is genuinely very happy and healthy - I've never seem him less anxious and stressed – and think we need to be careful to not to uproot and impact his little life more than we need to.*
>
> *By the time he settled in after 6months we'd have to turn right around and send him back. It isn't fair to do to him. That's the root of where I'm coming from.*
>
> *I think there's a longer conversation we need to have and I'd like us to make these big decisions when the timing is right for both of us.*

43. The upshot of Jacobson's September 24 email was that he acknowledged and agreed that when Saylor moved to Los Angeles with Freeman it should be a permanent, "once in a lifetime" move, but Jacobson was "not prepared" to agree to such a move at that time. This meant that Saylor would continue to live with Jacobson in New York City and that Freeman would be able to see the dog only a few times per year. Furthermore, Jacobson's email makes clear that Jacobson believes he, not Freeman, ultimately gets to

decide when Saylor will be allowed to move to California to live with Freeman, who is the dog's rightful owner.

44.     In light of Jacobson's September 24 email, Freeman realized that Jacobson never was going to return Saylor to him. Accordingly, Freeman pretended to go along with Jacobson's position regarding the dog.

45.     On October 5, 2019, Freeman was in New York City, ostensibly to pick up Saylor for a weekend trip together. Freeman went to Jacobson's apartment that morning to pick up Saylor. He was accompanied by a friend, whom he had asked to join him as a potential witness. Jacobson was home, they had a brief friendly conversation, and Freeman left with the dog.

46.     After spending the day with Saylor at his favorite parks in New York City, unbeknownst to Jacobson, later that evening Freeman boarded a Jet Blue flight to California with Saylor. Freeman and Saylor flew together in a Mint class private suite.

47.     On October 7, 2019, Freeman telephoned Jacobson and informed him that he had brought Saylor to Los Angeles. Jacobson became furious, accused Freeman of "stealing" the dog, and said (in sum and substance): "I am going to have you arrested. I am going to hurt you. I am going to take everything from you. You stole my dog. I am going to get you. I could kill you. Better watch your back."

48.     On October 12, 2019, Freeman and Jacobson again spoke by telephone about the situation. Although Freeman was hopeful they might reach an amicable resolution, Jacobson continued to refuse to acknowledge that Freeman was Saylor's rightful owner and demanded that Freeman return the dog to New York City. He continued to threaten Freeman with bodily harm, stating (in sum and substance): "I am going to get you. I have something on you. You're gonna pay for what you did. It's going to get dirty."

49. Jacobson's words and demeanor during the October 7 and October 12 telephone conversations deeply frightened Freeman, who feared for his personal safety.

50. Freeman has not had any personal communications with Jacobson since October 12, 2019.

### D. The Dognapping by Defendant Usdin

51. On October 24, 2019, at approximately 9:15 a.m., Freeman left his apartment in Toluca Lake to take Saylor for his morning walk. Around 10:10 a.m., Freeman and Saylor turned onto Woodbridge Street near Lankershim Boulevard.

52. At 10:14 a.m., an unknown man approached Freeman. The man appeared to be speaking on a cell phone and started to hand Freeman what appeared to be a business card. When Freeman stopped, the man moved close to Freeman and grabbed him and said to him in a very threatening voice (in sum and substance): "Don't do anything or you will get hurt. People are coming. Don't say anything or the dog will get hurt." Freeman felt a hard object pressed against his side, which he believed was a gun. Freeman believed he was being mugged.

53. Right after he was grabbed by the man, another man ran around a white car that was parked next to the curb, unleashed Saylor, and then lifted and carried Saylor back to the car. Freeman did not notice this other man until he saw Saylor being carried away.

54. At first, Freeman did not recognize the man who had stolen Saylor. He was shocked – his mind in "slow motion" as he tried to process what was happening – and then he chased after the man with Saylor. Freeman tried to retrieve Saylor, who was whining and howling in distress, from the backseat of the car, while the man (who was in the backseat with Saylor) was pushing, slapping, and hitting at him.

55. The first unknown man followed Freeman, yelling "I'm gonna hurt you" and "your dog is gonna get hurt." The man pulled Freeman away from the car, and at that point Freeman recognized that it was Defendant Usdin who had snatched Saylor. Freeman stood there stunned, as the white car drove off with Saylor in the backseat. The first unknown man walked away, while Freeman was left there holding an empty leash in utter shock and disbelief. The entire incident lasted approximately 20 seconds

56. Upon information and belief, Jacobson planned, directed, and paid for Usdin to travel to California to assault Freeman and steal Saylor.

57. Upon information and belief, the unknown man who first approached and assaulted Freeman was hired by Usdin and/or Jacobson to help them carry out their scheme to dognap Saylor.

58. Freeman did not consent to the taking of Saylor by Usdin.

59. The car that Usdin was driving was a white SUV. A security camera recording from an apartment complex on Woodbridge Street was obtained by Freeman. The recording shows Usdin in the driver's seat of the car as it parks on the street next to where Freeman was mugged. The recording shows the unknown man approaching the car, crouching down next to the front passenger door and conversing with someone inside the car, then shows the unknown man speaking on a cell phone and standing around and waiting. The recording then shows Freeman walking down the sidewalk with Saylor, where the white SUV was parked, the unknown man approaching him, Usdin sneaking out of the car to grab Saylor, and another unknown person sliding into the driver's seat of the car and driving away. The recording shows the dognapping in its entirety.

60. Around the same time as the dognapping, someone (upon information and belief, Jacobson) hacked into Freeman's cell phone account, changed the passcode, and terminated his service.

61. After the dognapping, Freeman remained scared for his life, because he did not know where the unknown man who had accosted him was or whether he was waiting to assault him. As intended by Jacobson, Freeman's lack of cellular service hampered his ability to seek help.

62. Around 11:40 a.m. that morning, Freeman went to the North Hollywood LAPD precinct to file a police report against Usdin and the unknown man. After obtaining his personal information, the desk sergeant informed Freeman that Jacobson already had filed a complaint against Freeman for stealing Saylor. She told Freeman that Jacobson had presented documents claiming he owned Saylor and said that Freeman was merely a dog walker who had stolen Saylor and taken him to Los Angeles. These statements by Jacobson to the police were deliberately false and perjured. Without bothering to investigate the truth of the situation, the desk sergeant told Freeman that Jacobson had the right to take the dog, and she did not appear interested in pursuing the matter further.

63. The next day, October 25, 2019, Freeman went to the Van Nuys LAPD precinct and filed a police report against Usdin and the unknown man. The detectives at the Van Nuys precinct investigated the matter, but ultimately advised Freeman that they lacked the authority to travel to New York to make an arrest and told Freeman that his only option would be to file a civil lawsuit.

64. Upon information and belief, Saylor currently lives with Jacobson and Usdin at their apartment on Reade Street in New York City.

65. At all relevant times since on or about October 24, 2019, Jacobson has had wrongful possession, actual or constructive, of Saylor. Upon information and belief, Usdin has aided and abetted Jacobson in his wrongful possession of Saylor.

66. On or about March 25, 2020, Freeman confirmed through a mutual friend that Saylor was living with Jacobson and Usdin.

67. As a result of the incident on October 24, 2019, Freeman suffered severe emotional distress that was caused by the wrongful and outrageous conduct of the defendants.

68. Jacobson and Usdin knew or acted with reckless disregard of the probability that Freeman would suffer severe emotional distress caused by their wrongful and outrageous conduct.

69. In November 2019, Freeman attempted to resolve the situation with Jacobson regarding Saylor by using their mutual friends as intermediaries. Jacobson first accepted and then several days later reneged on these efforts and insisted on using an independent mediator. Accordingly, Freeman retained Debra Vey Voda-Hamilton, who specializes in animal custody disputes, to act as mediator, for which he paid $2000. Between December 2019 and February 2020, the mediator attempted to work with the parties regarding Saylor, but Jacobson refused to cooperate.

70. In or about January 2020, Jacobson told a mutual friend that Freeman would have to sue him if he wanted his dog back.

**PLAINTIFF'S CLAIMS AGAINST DEFENDANT JACOBSON**

71. Based on the factual allegations set forth above, along with reasonable inferences drawn in the plaintiff's favor, Plaintiff Freeman asserts the following claims against Defendant Jacobson:

72. Count One: Conversion, for the wrongful detention of the plaintiff's property in connection with the 150 shares of Match Group stock paid for and owned by Freeman. This claim arises under New York law. Plaintiff is entitled to an order requiring Jacobson to transfer the shares to Freeman and to pay all fees and costs associated therewith (or alternately an award of compensatory damages for the full value of the shares), an award of compensatory damages for any financial damages caused by the wrongful conversion, an award of compensatory damages for any emotional distress caused by the wrongful conversion, and an award of punitive damages to punish Jacobson for his willful and malicious conduct.

73. Count Two: Unjust Enrichment, for the acceptance and use of the plaintiff's money to purchase the 150 shares of Match Group stock that in fairness and good conscience should not be retained by Jacobson. This claim arises under New York law. Plaintiff is entitled to an order requiring Jacobson to transfer the shares to Freeman and to pay all fees and costs associated therewith (or alternately an award of compensatory damages for the full value of the shares), an award of compensatory damages for any financial damages caused by the unjust enrichment, an award of compensatory damages for any emotional distress caused by the unjust enrichment, and an award of punitive damages to punish Jacobson for his willful and malicious conduct.

74. Count Three: Conversion, for the wrongful detention of the plaintiff's property, to wit, the dog Saylor, beginning in or about May 2019 and continuing to the present. This claim arises under New York law. Plaintiff is entitled to an order requiring Jacobson to transfer the dog to Freeman and to pay all fees and costs associated therewith, an award of compensatory damages for any financial damages caused by the wrongful conversion, an award of compensatory damages for any emotional distress caused by the

wrongful conversion, and an award of punitive damages to punish Jacobson for his willful and malicious conduct.

75.  Count Four:  Conversion, for the wrongful taking of the plaintiff's property, to wit, the dog Saylor, on or about October 24, 2019.  This claim arises under New York and/or California law.  Plaintiff is entitled to an order requiring Jacobson to transfer the dog to Freeman and to pay all fees and costs associated therewith, an award of compensatory damages for any financial damages caused by the wrongful conversion, an award of compensatory damages for any emotional distress caused by the wrongful conversion, and an award of punitive damages to punish Jacobson for his willful and malicious conduct.

76.  Count Five:  Assault, for the incident on October 24, 2019, in which the unknown man, who had been hired by Usdin and/or Jacobson, threatened Freeman with bodily harm as part of their scheme to assault Freeman and steal Saylor.  This claim arises under California law.  Plaintiff is entitled to an award of compensatory damages for any financial damages caused by the assault, an award of compensatory damages for any emotional distress caused by the assault, and an award of punitive damages to punish Jacobson for his willful and malicious conduct in connection with the assault.

77.  Count Six:  Battery, for the incident on October 24, 2019, in which the unknown man, who had been hired by Usdin and/or Jacobson, physically touched and grabbed Freeman in a harmful or offensive manner as part of their scheme to assault Freeman and steal Saylor.  This claim arises under California law.  Plaintiff is entitled to an award of compensatory damages for any financial damages caused by the battery, an award of compensatory damages for any emotional distress caused by the battery, and an award of punitive damages to punish Jacobson for his willful and malicious conduct in connection with the battery.

78. Count Seven: Intentional infliction of emotional distress, for the incident on October 24, 2019, in which Jacobson planned, directed, and paid for Usdin to travel to California to assault Freeman and steal Saylor and filed a false police report claiming he owned the dog. Jacobson's conduct was outrageous and beyond the bounds of decency in a civilized society. This claim arises under California and/or New York law. Plaintiff is entitled to an award of compensatory damages for any financial damages caused by the defendant's outrageous conduct, an award of compensatory damages for any emotional distress caused by the defendant's outrageous conduct, and an award of punitive damages to punish Jacobson for his willful and malicious conduct in connection with the battery.

## PLAINTIFF'S CLAIMS AGAINST DEFENDANT USDIN

79. Based on the factual allegations set forth above, along with reasonable inferences drawn in the plaintiff's favor, Plaintiff Freeman asserts the following claims against Defendant Usdin:

80. Count Eight: Conversion, for the wrongful detention of the plaintiff's property, to wit, the dog Saylor, beginning in or about May 2019 and continuing to the present. This claim arises under New York law. Upon information and belief, Usdin aided and abetted Jacobson's wrongful conversion of Saylor, is jointly liable for any financial and emotional distress damages caused by the wrongful conversion, and is separately liable for an award of punitive damages to punish Usdin for his willful and malicious conduct.

81. Count Nine: Conversion, for the wrongful taking of the plaintiff's property, to wit, the dog Saylor, on or about October 24, 2019. This claim arises under New York and/or California law. Plaintiff is entitled to an award of compensatory damages for any financial damages caused by the wrongful conversion, an award of compensatory damages for any

emotional distress caused by the wrongful conversion, and an award of punitive damages to punish Usdin for his willful and malicious conduct.

82. Count Ten: Assault, for the incident on October 24, 2019, in which the unknown man, who had been hired by Usdin and/or Jacobson, threatened Freeman with bodily harm as part of their scheme to assault Freeman and steal Saylor. This claim arises under California law. Plaintiff is entitled to an award of compensatory damages for any financial damages caused by the assault, an award of compensatory damages for any emotional distress caused by the assault, and an award of punitive damages to punish Usdin for his willful and malicious conduct in connection with the assault.

83. Count Eleven: Battery, for the incident on October 24, 2019, in which the unknown man, who had been hired by Usdin and/or Jacobson, physically touched and grabbed Freeman in a harmful or offensive manner as part of their scheme to assault Freeman and steal Saylor. This claim arises under California law. Plaintiff is entitled to an award of compensatory damages for any financial damages caused by the battery, an award of compensatory damages for any emotional distress caused by the battery, and an award of punitive damages to punish Usdin for his willful and malicious conduct in connection with the battery.

84. Count Twelve: Intentional infliction of emotional distress, for the incident on October 24, 2019, in which Jacobson planned, directed, and paid for Usdin to travel to California to assault Freeman and steal Saylor. Usdin's conduct was outrageous and beyond the bounds of decency in a civilized society. This claim arises under California and/or New York law. Plaintiff is entitled to an award of compensatory damages for any financial damages caused by the defendant's outrageous conduct, an award of compensatory damages for any emotional distress caused by the defendant's outrageous conduct, and an

award of punitive damages to punish Usdin for his willful and malicious conduct in connection with the battery.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38, the plaintiff hereby demands a trial by jury as to all issues triable by jury in the above-captioned civil action.

## PRAYER FOR RELIEF

WHEREFORE, the plaintiff respectfully prays for relief as follows:

A. A judgment finding Defendant Jacobson liable to Plaintiff on Counts One through Seven;

B. A judgment finding Defendant Usdin liable to Plaintiff on Counts Eight through Twelve;

C. A judgment awarding Plaintiff compensatory damages, in an amount to be proved at trial, for any financial and emotional distress damages he suffered in connection with each Count for which Defendants are liable;

D. A judgment imposing an award of punitive damages, in an amount to be proved at trial, on Defendant Jacobson in connection with each Count for which he is liable;

E. A judgment imposing an award of punitive damages, in an amount to be proved at trial, on Defendant Usdin in connection with each Count for which he is liable;

    F.    An order imposing appropriate injunctive remedies on Defendants, including but not limited to an order requiring Defendant Jacobson to transfer the dog Saylor to Plaintiff and to pay all fees and costs associated therewith and an order requiring Defendant Jacobson to transfer the 150 Match Group shares to Plaintiff and to pay all fees and costs associated therewith;

    G.    Pre-judgment and post-judgment interest as allowed by law;

    H.    Attorney's fees, costs, and disbursements as allowed by law; and

    I.    Such other and further legal and equitable relief as this Court deems necessary, just, and proper.

Dated:    December 1, 2020
              New York, NY

                                    Respectfully submitted,

                                    *Steven M. Warshawsky*
By:    _____
                                    STEVEN M. WARSHAWSKY (SW 5431)
                                    The Warshawsky Law Firm
                                    100 South Bedford Road, Suite 340
                                    Mount Kisco, New York  10549
                                    Tel:  (914) 514-2329
                                    Email:  smw@warshawskylawfirm.com

                                    *Attorneys for Plaintiff Aaron Freeman*