UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

AARON FREEMAN,

                                        Plaintiff,                    20-CV-10040 (SN)

                    -against-                                          OPINION & ORDER

TREVOR JACOBSON and JORDAN USDIN,

                                        Defendants.

-----------------------------------------------------------------X

SARAH NETBURN, United States Magistrate Judge:

        Aaron Freeman ("Freeman") sued Trevor Jacobson ("Jacobson") and Jordan Usdin

("Usdin," and collectively, "Defendants") for wrongful conversion of stocks, assault, and the

theft of his dog. See generally ECF No. 1, Complaint ("Compl."). Defendants move to dismiss

the Complaint, arguing that the Court lacks subject matter jurisdiction, that venue is improper,

that Freeman's claims are time-barred, and that the Complaint fails to state a claim upon which

relief can be granted. The motion is DENIED.

                                        BACKGROUND

I.      Factual Background

        Freeman and Jacobson were in a romantic relationship and lived together in New York

City from August 2002 to December 2015. "Compl." at ¶ 7. In late 2016, Jacobson and Usdin

became involved in a romantic relationship and currently reside together in New York City. Id. ¶

9–11. In February 2019, Freeman moved to California and currently resides there. Id. ¶ 12.

### A. The Match Group Stock Shares

In November of 2015, Jacobson's employer offered him the opportunity to purchase 300 shares of stock in Match Group, Inc., for $3,600. Id. ¶ 13, 16. Freeman and Jacobson agreed to purchase the shares, with each contributing half of the purchase price. Id. ¶ 15, 16. The shares were purchased in Jacobson's name and placed into a J.P. Morgan account arranged by Jacobson's employer. Id. ¶ 17. Freeman and Jacobson agreed to hold the shares in the J.P Morgan account to allow the shares to appreciate. Id. Upon Jacobson's promises, Freeman believed half of the shares belonged to him and would be given to him if he requested. Id. ¶ 18. Jacobson also acknowledged Freeman's right to half of the shares through words and deeds. Id. ¶ 20. When their relationship ended, they agreed to continue holding the shares in Jacobson's J.P. Morgan account. Id. ¶ 19.

In July and December of 2018, Freeman asked Jacobson to transfer his half of the shares to him. Id. ¶ 21. On both occasions, Jacobson agreed to comply with Freeman's request, but he did not transfer the shares. Id. In June 2019, Jacobson informed Freeman that he would transfer the shares from his J.P. Morgan account to his personal account "as the first step of gifting them to Freeman," however, Jacobson never completed the transfer to Freeman. Id. ¶ 22, 23. Freeman continued to inquire about his shares, which Jacobson ignored. Id. ¶ 23. In January 2020, Jacobson told a mutual friend that Freeman would have to sue him if he wanted his shares. Id. To date, the shares are worth approximately $20,000, and Freeman alleges that Jacobson's refusal to transfer the shares has caused him financial damages and emotional distress. Id. ¶ 26, 27.

### B. Saylor, the Pet Dog

In March 2010, when Freeman and Jacobson were together, Freeman adopted Saylor, a mixed-breed male dog. Id. ¶ 28. Freeman is listed as Saylor's owner in the adoption paperwork

2

with the New York City Department of Health and Mental Hygiene, and on Saylor's microchip registration. Id. ¶ 28–30. Freeman also paid for all of Saylor's licensing fees. Id. ¶ 29.

Freeman became Saylor's primary caretaker in January 2016, when Jacobson moved out of their apartment, but both agreed to share custody of the dog. Id. ¶ 31, 33. The parties alternated one-and-two-week periods with Saylor. Id. ¶ 33. Jacobson paid for Saylor's daily needs on his weeks, and for half of his crating and veterinary expenses. Id. Freeman and Jacobson followed this arrangement amicably until May 2019. Id.

In December 2018, Jacobson agreed to take care of Saylor while Freeman relocated to California. Id. ¶ 34. Both parties agreed that Jacobson would have Saylor for the first half of 2019, and Freeman would have Saylor for the second half. Id. Once in California, Freeman texted Jacobson about picking up Saylor, but he did not respond. Id. ¶ 35. On May 20, 2019, Freeman called Jacobson to discuss bringing Saylor to California, but Jacobson responded that he would not give Saylor back and intended to keep him. Id. ¶ 36. After this conversation, Freeman continuously reached out to Jacobson about bringing Saylor to California and, eventually, Jacobson agreed to allow Freeman to take Saylor in September. Id. ¶ 37. Jacobson reneged on their agreement, however, refusing to return Saylor and threatening to hide him in an unknown location in New Jersey. Id. ¶ 39. In response to an email by Freeman, Jacobson wrote that he was not prepared to allow Freeman to take Saylor to California. Id. ¶ 42. Realizing that Jacobson would not return Saylor to him, Freeman pretended to acquiesce. Id. ¶ 44.

In October 2019, Freeman picked up Saylor for what he claimed was a weekend trip, but instead took him to California. Id. ¶ 45. After Freeman informed Jacobson that Saylor was in California, Jacobson accused Freeman of "stealing" Saylor, demanded that he return the dog, and

threatened to hurt Freeman and have him arrested. Id. ¶ 46–48. These threats frightened Freeman and caused him to fear for his personal safety. Id. ¶ 49.

On the morning of October 24, 2019, Freeman was walking Saylor when he was approached by an unknown man, who grabbed him and threatened to hurt him or Saylor if he tried to do anything. Id. ¶ 51–52. Freeman felt a hard object pressed against his side, which he believed was a gun, and thought he was being mugged. Id. ¶ 52. As the unknown man restrained him, another man emerged from a parked car, unleashed Saylor, and carried the dog to the car. Id. ¶ 53. Freeman tried to retrieve Saylor by chasing after the man, but again the unknown man threatened to hurt him and Saylor. Id. ¶ 54–55. When the unknown man pulled Freeman away from the car, Freeman recognized Usdin as the man who carried Saylor away. Id. ¶ 55. Freeman alleges that security footage from a nearby apartment shows the incident in its entirety. Id. ¶ 59. Freeman never consented to Usdin taking Saylor. Id. ¶ 58.

During the incident, Freeman alleges that Jacobson hacked into his cell phone account, changed the passcode, and ended his service to prevent him from seeking help. Id. ¶ 60–61. After the incident, Freeman attempted to file a police report against Usdin and the unknown man with the LAPD's North Hollywood precinct. Id. ¶ 62. He was informed, however, that Jacobson had presented documents that claimed he owned Saylor and had filed a complaint against Freeman for theft. Id. The following day, Freeman filed a report with the LAPD's Van Nuys precinct. Id. ¶ 63. The officers advised him to file a civil lawsuit because they lacked the authority to travel to New York and make an arrest. Id. In January 2020, Jacobson told a mutual friend that Freeman must sue him if he wanted Saylor back. Id. ¶ 70.

Freeman claims that Jacobson—through Usdin's aiding and abetting—has had wrongful possession of Saylor since October 24, 2019. Id. ¶ 65. Freeman also alleges that Jacobson

planned, directed, and paid for Usdin to travel to California to assault Freeman and steal Saylor, and that the unknown man was hired by Usdin to assist him. Id. ¶ 56–57. Lastly, Freeman alleges that the Defendants' wrongful conduct caused him to suffer severe emotional distress and that they knew or acted with the probability that their conduct would cause such distress. Id. ¶ 67–68.

## II.     Procedural Background

Freeman filed his Complaint on December 1, 2020. The Honorable Gregory H. Woods issued an Order to Show Cause *sua sponte*, requiring Freeman to show that the amount in controversy exceeded $75,000, which Freeman did. See ECF Nos. 7, 8. On January 27, 2021, the parties consented to my jurisdiction for all further proceedings. See ECF No. 28. On February 4, 2021, the Defendants filed their Motion to Dismiss, which the Plaintiff opposed. ECF Nos. 31, 37, 38.

## DISCUSSION

The Defendants move to dismiss for (1) lack of subject matter jurisdiction, (2) *forum non conveniens*, (3) time-barred claims, and (4) failure to state a claim.

## I.     Dismissal for Lack of Subject Matter Jurisdiction

In his Complaint, Freeman invokes jurisdiction under 28 U.S.C. § 1332, which requires complete diversity of the parties and damages above $75,000. Defendants claim that Freeman cannot prove the necessary amount of damages, and therefore the Court does not have subject matter jurisdiction.

### A.  Standard of Review

Federal Rule of Civil Procedure 12(b) governs motions to dismiss. See Fed. R. Civ. P. 12(b). Under Rule 12(b)(1), a party may move to dismiss a complaint for lack of subject-matter jurisdiction. Fed. R. Civ. P. 12(b)(1). "When considering a motion to dismiss pursuant to Rule

5

12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." Sweet v. Sheahan, 235 F.3d 80, 83 (2d. Cir. 2000).

Under 28 U.S.C. § 1332, subject-matter jurisdiction exists when a case involves parties who are citizens of different states and an amount in controversy that exceeds $75,000. As the party invoking federal jurisdiction, a plaintiff must demonstrate "a 'reasonable probability' that the amount in controversy requirement is satisfied." Pyskaty v. Wide World of Cars, LLC, 856 F.3d 216, 223 (2d Cir. 2017) (citing Tongkook Am,, Inc. v. Shipton Sportwear Co., 14 F.3d 781, 784 (2d Cir. 1994)).

Although there is a "presumption that the face of the complaint is a good faith representation of the amount in controversy," a defendant may rebut this presumption. Colavito v. N.Y. Organ Donor Network, Inc., 438 F.3d 214, 221 (2d Cir. 2006) (quoting Wolde-Meskel v. Vocational Instruction Project Cmty. Servs, Inc., 166 F.3d 59, 63 (2d Cir. 1999)). To prevail, a defendant must show to a "legal certainty" that the claim is less than the jurisdictional threshold. Burroughs v. Fed. Express Corp., No. 18-cv-08641(PAE) (SN), 2020 WL 2950976, at *4 (S.D.N.Y. Jan. 7, 2020) (quoting Neumann v. Iovino, No. 06-cv-11367 (DC), 2007 WL 1988880, at *3 (S.D.N.Y. July 10, 2007)). A legal certainty exists when "the legal impossibility of recovery [is] so certain as virtually to negative the plaintiff's good faith in asserting the claim." Tongkook Am., Inc., 14 F.3d at 785 (quoting McDonald v. Patton, 240 F.2d 424, 426 (4th Cir. 1957)). Therefore, a case will be dismissed only if, based on the face of the pleadings, it is apparent to a legal certainty "that the plaintiff cannot recover the amount claimed or if, from the proofs, the court is satisfied to a like certainty that the plaintiff never was entitled to recover that amount. . . ." St. Paul Mercury Indem. Co. v. Red Cab Co., 303 U.S. 283, 289 (1938).

The Defendants claim that Freeman has not established a reasonable probability that his damages are more than $75,000. To prevail on their motion, the Defendants must show to a "legal certainty" that the amount in controversy does not exceed $75,000. In considering whether a plaintiff meets the amount in controversy, the Court may aggregate claims because 28 U.S.C. § 1332 "confers jurisdiction over civil actions rather than specific claims alleged in a complaint." Wolde-Meskel, 166 F.3d at 62 (citations and internal quotation marks omitted); see also Fed. R. Civ. P. 18(a) ("A party asserting a claim . . . may join, as independent or alternative claims, as many claims as it has against an opposing party.").

The Court may consider punitive damages in addition to compensatory damages to calculate the amount in controversy. See A.F.A. Tours, Inc. v. Whitchurch, 937 F.2d 82, 87 (2d Cir. 1991) ("[I]f punitive damages are permitted under the controlling law, the demand for such damages may be included in determining whether the jurisdictional amount is satisfied." (citing 14A Wright & Miller, Fed. Prac. & Proc. § 3702)).

### B.  Application

Defendants do not make a serious attempt to challenge subject matter jurisdiction, and Freeman easily establishes a reasonable probability that his claims exceed $75,000. Freeman's claims for conversion of the Match Group stock alleges that their value is approximately $22,425. See Edidin v. Uptown Gallery, Inc., No. 09-cv-07829 (DLC) (GWG), 2010 WL 2194817, at *1 (S.D.N.Y. June 1, 2010) ("When a defendant is liable for conversion, the plaintiff may recover the value of the property at the time and place of conversion, plus interest."). In addition, punitive damages are available for conversion "where circumstances show that the conversion was accomplished with malice, insult, reckless and willful disregard for plaintiff's rights, or by other proof evidencing the aggravated nature of the act." Morales v. Kavulich &

7

Assoc., P.C., 294 F. Supp.3d 193, 198 (S.D.N.Y. 2018) (citing Caballero v. Anselmo, 759 F. Supp. 144, 153 (S.D.N.Y. 1991)); see also Whitney v. Citibank N.A., 782 F.2d 1106, 1118 (2d Cir. 1986) (punitive damages available where "defendant's conduct amounts to such gross, wanton or willful fraud, dishonesty, or malicious wrongdoing as to involve a high degree of moral culpability"). Freeman's claims for the theft (and conversion) of Saylor includes damages for emotional distress and punitive damages for Defendants' willful and malicious conduct. Similarly, Freeman seeks emotional distress and punitive damages in connection with the intentional infliction of emotional distress and the alleged assault and battery during the dognapping.

Defendants fail to engage in the question whether emotional distress damages are available to Freeman for the loss of Saylor. See e.g., Fowler v. Town of Ticonderoga, 516 N.Y.2d 368, 370 (3d Dep't 1987) ("a dog is personal property and damages may not be recovered for mental distress caused by its malicious or negligent destruction"). The Court need not weigh in on this legal question because Freeman can plainly assert emotional distress damages for the intentional torts directed at him personally during the dognapping incident.

At a minimum, Freeman establishes to a reasonable probability that he suffered garden-variety emotional distress. For a garden-variety emotional distress claim, "the evidence of mental suffering is limited to the plaintiff's testimony of . . . his or her injury." See MacMillan v. Millennium Broadway Hotel, 873 F. Supp. 2d 546, 560 (S.D.N.Y. 2012) (quoting Olsen v. County of Nassau, 615 F. Supp. 2d 35, 46 (E.D.N.Y. 2009)). Freeman alleges that because of the events that took place on October 24, 2019, he "suffered severe and emotional distress that was caused by the wrongful and outrageous conduct of the defendants." Compl., ¶ 67. Courts in this

district typically award $30,000 to $125,000 for such injuries. See Duarte v. St. Barnabas Hosp., 341 F. Supp. 3d 306, 320 (S.D.N.Y. 2018) (citing Emamian, 2018 WL 2849700, at *16)).

Finally, "in cases of personal torts, 'vindictive actions,' such as assault and battery . . . where the elements of fraud, malice, gross negligence, cruelty, or oppression are involved, punitive or exemplary damages may be recovered." Pepe v. Maklansky, 67 F. Supp. 2d 186, 188 (S.D.N.Y. 1999) (citing Walsh v. Segale, 70 F.2d 698, 699 (2d Cir. 1934)). Punitive damages have "been awarded and upheld in cases involving intentional torts . . ." Laurie Marie M. v. Jeffrey T.M., 559 N.Y.S.2d 336, 340 (2d Dep't 1990), aff'd, 77 N.Y.2d 981 (1991).

Thus, Freeman has alleged to a reasonable probability that his injuries exceed $75,000 in compensatory, emotional distress, and punitive damages. Accordingly, subject matter jurisdiction is proper under 28 U.S.C. § 1332.

## II.   Dismissal on *Forum Non Conveniens* Grounds

The Defendants move to dismiss on *forum non conveniens* grounds, arguing that Freeman is engaged in prohibited forum shopping.

"The doctrine of *forum non conveniens* is a discretionary device permitting a court in rare instances to dismiss a claim even if the court is a permissible venue with proper jurisdiction over the claim." Carey v. Bayerische Hypo-Und Vereinsbank AG, 370 F.3d 234, 237 (2d Cir. 2004) (citations and internal quotation marks omitted). "A defendant who invokes *forum non conveniens* generally bears a 'heavy burden' in opposing plaintiff's chosen forum." Villella v. Chem. & Mining Co. of Chile, 15-cv-02106 (ER), 2017 WL 1169629, at *5 (S.D.N.Y. Mar. 28, 2017) (quoting Sinochem Int'l Co. v. Malay. Int'l Shipping Corp., 549 U.S. 422, 430 (2007)). Further, courts will give "greater deference to a plaintiff's chosen forum when that choice is motivated by convenience and give less deference when plaintiff is merely seeking a tactical

advantage." Id. at *6. The decision to dismiss on *forum non conveniens* grounds "lies wholly within the broad discretion of the district court." Kravitz v. Binda, No. 17-cv-07461 (ALC) (SN), 2020 WL 927534, at *10 (S.D.N.Y. Jan. 21, 2020) (quoting Scottish Air Int'l, Inc. v. British Caledonian Grp., PLC, 81 F.3d 1224, 1232 (2d Cir. 2005)).

Courts apply a three-step process to determine if dismissal is a proper exercise of their discretion under the doctrine of *forum non conveniens*:

> At step one, a court determines the degree of deference properly accorded the plaintiff's choice of forum. At step two, it considers whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute. Finally, at step three, a court balances the private and public interests implicated in the choice of forum.

Norex Petroleum Ltd. v. Access Indus., Inc., 416 F.3d 146, 153 (2d Cir. 2005) (citing Iragorri v. United Techs. Corp., 274 F.3d 65, 73 (2d Cir. 2001) (en banc)).

Here, the Defendants fail to meet their heavy burden to show that Freeman's chosen forum was inconvenient and entitled to discretionary dismissal—in fact, their arguments are puzzling. Freeman followed the guidelines of the federal venue statue by filing this action in the Defendants' home district, where a substantial part of the property at issue is situated. See 28 U.S.C. § 1391(b)(2). The Defendants fail to make any argument regarding why the Southern District of New York is an inconvenient forum to try Freeman's claims, or why his choice of forum is not entitled deference. And although they argue that Freeman could have sued in California *for his own convenience*, they do not propose an alternative forum. Indeed, they do not even attempt to show that trying this case in this district would pose *any* hardship on them.

Because the Defendants have not meaningfully engaged with the proper standards under the doctrine, the Court finds that this is not one of those rare circumstances to exercise its discretion to dismiss under *forum non conveniens* grounds.

### III.    Dismissal for Untimely Claims

Defendants argue that New York's one-year statute of limitations bars Freeman's claims for assault and battery and intentional infliction of emotional distress because they accrued on October 24, 2019, and Freeman filed his Complaint on December 1, 2020—more than a year later. Although Freeman brought his assault and battery claims under California law, he concedes that New York's statute of limitations applies. He counters, however, that the limit was tolled continuously from March 20, 2020, to November 3, 2020, pursuant to New York Executive Orders 202.8 through 202.67. Therefore, he contends that his claims are timely.

#### A.  Law Governing the Applicable Statutes to Limitations

"In diversity cases, a federal court located in New York will generally apply the . . . the statute of limitations of the law of the forum state, not the law of the state in which the action accrued." Kleiman v. Kings Point Cap. Mgmt., LLC, No. 18-cv-04172 (SJF) (AKT), 2020 WL 7249441, at *8 (E.D.N.Y. Sept. 30, 2020), adopted, 2020 WL 7021648 (E.D.N.Y. Nov. 30, 2020) (citing SOCAR v. Boeing Co., 144 F. Supp. 3d 391, 395 (E.D.N.Y. 2015)). The Court finds—and the parties agree—that New York's statute of limitations applies here.

In New York, the statute of limitations for intentional torts, like claims for assault, battery, and intentional infliction of emotional distress, is one year from the time the injury accrues. N.Y. C.P.L.R. § 215. As a result of the COVID-19 pandemic, however, Governor Cuomo issued Executive Orders 202.67 to 202.8, which tolled "any specific time limit for the commencement, filing, or service of any legal action, notice, motion, or other process or proceeding" from March to November of 2020. N.Y. Gov. Exec. Order No. 202.67–292.8 (2020), available at https://www.governor.ny.gov/executiveorders [hereinafter "Executive Orders"]. Courts in this Circuit have held that Governor Cuomo's Executive Orders arguably

11

tolled the statute of limitations as to state claims in federal cases without corresponding federal statutes of limitations. See Citi Connect, LLC v. Loc. Union No. 3, Int'l Brotherhood of Elec. Workers, AFL-CIO, No. 20-cv-05147 (CM), 2020 WL 5940143, at *4 (S.D.N.Y. Oct. 7, 2020) (holding that the Court had to "borrow the 'arguably tolled' state statute of limitations" for a federal action); Bonilla v. City of N.Y., No. 20-cv-01704 (RJD) (LB), 2020 WL 6637214, at *3 (E.D.N.Y. Nov. 12, 2020) (holding that Executive Order 202.8's toll must be borrowed for a Section 1983 claim as it was borrowed in Citi Connect).

### B.  Application

Freeman's intentional tort claims accrued on October 24, 2019, and he filed his Complaint on December 1, 2020—more than 13 months after accrual. Thus, Freeman's Complaint fell outside of New York's standard one-year statute of limitations. See N.Y. C.P.L.R. § 215. The Court agrees, however, with the reasoning of our sister courts in finding that Governor Cuomo's Executive Orders continuously tolled the statute of limitations for 258 days. Because there are no applicable federal statutes of limitations for Freeman's claims, this Court applies the tolling period in this case, allowing Freeman to timely file his claims all the way until July 9, 2021. Accordingly, Freeman's claims are not time-barred.

## IV.  Dismissal for Failure to State a Claim

The Defendants claim that Freeman's Complaint fails to state a claim upon which relief may be granted and therefore must be dismissed. See Federal Rule 12(b)(6).

### A.  Standard of Review

"A Rule 12(b)(6) motion challenges the sufficiency of the claims asserted in a complaint." Trs. of Upstate N.Y. Eng'rs Pension Fund v. Ivy Asset Mgmt., 131 F. Supp. 3d 103, 119 (S.D.N.Y. 2015). To state a legally sufficient claim, a complaint must allege "enough facts

to state a claim for relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted). A pleading that only "offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" Id. (quoting Twombly, 550 U.S. at 555). Lastly, in deciding a motion to dismiss pursuant to Rule 12(b)(6), a court must take "factual allegations [in the complaint] to be true and draw[ ] all reasonable inferences in the plaintiff's favor." Harris v. Mills, 572 F.3d 66, 71 (2d Cir. 2009).

### B.  Application

#### 1.  Claim One – Jacobson's Wrongful Conversion of Shared Stocks

The first claim of the Complaint alleges that Jacobson wrongfully converted Freeman's shares of the Match Group stock. Under New York law, "[c]onversion is any unauthorized exercise of dominion or control over property by one who is not the owner of the property which interferes with and is in defiance of a superior possessory right of another in the property." Schwartz v. Cap. Liquidators, Inc., 984 F.2d 53, 53 (2d Cir. 1993) (quoting Meese v. Miller, 79 A.D.2d 237, 242 (4th Dep't 1981)). To plead a claim of conversion, a "plaintiff must allege that '(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another[,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused.'" Sabilia v. Richmond, No. 11-cv-00739 (JPO) (MHD), 2011 WL 7091353, at *19 (S.D.N.Y. Oct. 26, 2011) (quoting Seanto Exps. v. United Arab Agencies, 137 F. Supp. 2d 445, 451 (S.D.N.Y. 2001)). Furthermore, "conversion occurs when funds designated for a particular purpose are used for an unauthorized purpose."

13

Babstock v. Babstock, 139 N.Y.S.3d 784, 790 (Sup. Ct., Richmond Cty. 2021) (citing Meese, 79 A.D.2d at 243).

The Defendants argue that Freeman cannot assert a conversion claim for the shared stocks because the stocks are not tangible property. Originally, New York law held that an action for conversion would not lie when intangible property—such as shares of stocks—was involved. See Sporn v. MCA Recs., Inc., 58 N.Y.2d 482, 489 (1983). In an effort "to expand conversion beyond the realm of tangible property," New York courts have adopted the "merger" doctrine under which an "intangible property right can be united [or merged] with a tangible object for conversion purposes." Thyroff v. Nationwide Mut. Ins. Co., 8 N.Y.3d 283, 289 (2007). Because of the merger doctrine, "intangible property may be subject to conversion when represented by a tangible manifestation, such as an electronic or paper record." Harris v. Coleman, 863 F. Supp. 2d 336, 345 (S.D.N.Y. 2012) (citing Thyroff, 8 N.Y.3d at 292)).  Since "it is [now] customary that stock ownership exclusively exists in electronic format," Freeman's conversion claim may survive even if his shares exist solely as electronic records in Jacobson's account. See Thyroff, 8 N.Y.3d at 292–93 (recognizing that "the protections of law should apply equally to both forms– physical and virtual").

Freeman has sufficiently pleaded that Jacobson converted half of the Match Group shares. First, Freeman established ownership through his purchase and agreement to own half the shares with Jacobson. Second, Freeman made several demands for his shares, which Jacobson acknowledged yet refused to return. Jacobson also told a mutual friend that Freeman would have to sue him to get his half of the shares, demonstrating refusal of Freeman's demands. Accordingly, the Defendants' motion to dismiss the claim is denied.

### 2. Claim Two – Jacobson's Enrichment of the Shared Stocks

In New York, "[a]n unjust enrichment claim 'rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another.'" Network Enters., Inc. v. Reality Racing, Inc., No. 09-cv-04664 (RJS), 2010 WL 3529237, at *7 (S.D.N.Y. Aug. 24, 2010) (quoting IDT Corp. v. Morgan Stanley Dean Witter & Co., 12 N.Y.3d 132, 134 (2009)). To recover on a claim of unjust enrichment, a plaintiff "must establish (1) that the defendant was enriched; (2) that the enrichment was at the plaintiff's expense; and (3) that the circumstances are such that in equity and good conscience the defendant should return the money or property to plaintiff." Golden Pac. Bancorp v. FDIC, 273 F.3d 509, 519 (2d Cir. 2001) (quoting Universal City Studios, Inc. v. Nintendo Co., 797 F.2d 70, 79 (2d Cir.1986)).

Freeman has sufficiently alleged that Jacobson was unjustly enriched. First, Jacobson accepted Freeman's contribution for half the purchase price of the shares, which Jacobson now controls in his bank account and have appreciated to more than $20,000. Second, Jacobson agreed to split the shares, and he reneged on that agreement. Lastly, the Court finds that this establishes a claim that equity and good conscience require Jacobson to return Freeman's shares.

### 3. Claims Three, Four, Eight, and Nine – Defendants' Conversion of Saylor

Freeman contends that Jacobson wrongfully converted and detained Saylor, and that Usdin aided and abetted that conversion. As stated above, to establish a conversion claim, a "plaintiff must allege that '(1) the party charged has acted without authorization, and (2) exercised dominion or a right of ownership over property belonging to another[,] (3) the rightful owner makes a demand for the property, and (4) the demand for the return is refused.'" Sabilia, 2011 WL 7091353, at *19.

15

Freeman alleges that Jacobson acted without authorization and exercised dominion over Saylor by reneging continuously on their agreement to have Saylor relocate to California for the second half of 2019. Furthermore, although Freeman and Jacobson agreed to share custody of Saylor, Freeman alleges that Saylor is his property because he adopted Saylor, is listed as Saylor's owner in official documents, and was Saylor's primary caretaker after the couple separated. He also alleges that he made multiple demands for Jacobson to return Saylor, which Jacobson refused. Moreover, Jacobson threatened to hide Saylor and stated that he was not prepared to let Saylor move, again refusing Freeman's demands.

Freeman also alleges that Jacobson converted Saylor when Jacobson planned, directed, and paid for Usdin and the unknown man to steal the dog—thus exercising unauthorized dominion over Saylor. Freeman did not consent to letting Usdin take Saylor and demanded that Saylor be returned. Lastly, the Defendants have not returned Saylor, and Jacobson told a mutual friend that the only way he would return Saylor was if Freeman sued—again demonstrating refusal of Freeman's demands.

Next, Freeman alleges that Usdin aided and abetted the conversion because he had knowledge and substantially assisted in taking Saylor from Freeman. Alternatively, Freeman alleges that Usdin can be viewed as the primary wrongdoer because he took Saylor without Freeman's authorization, Freeman demanded that he return Saylor, and Saylor remains with Usdin and Jacobson. See Sabilia, 2011 WL 7091353 at *19. Viewed in the light most favorable to Freeman, the Court finds that he has sufficiently pleaded these conversion claims.

### 4. Claims Five, Six, Ten, and Eleven – Assault and Battery

Freeman alleges that the Defendants aided and abetted the unknown man's assault and battery on Freeman during the dognapping incident. Freeman originally brought these claims

16

under California law. In his briefing, however, he concedes that New York law should apply to his claims, which is sufficient to avoid a conflict of laws analysis. See, e.g., Motorola Credit Corp. v. Uzdan, 388 F.3d 39, 61 (2d Cir. 2004) (finding that where "the parties' briefs assume that New York law controls . . . such 'implied consent . . . is sufficient to establish choice of law.'" (quoting Krume v. Westpoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000))).

In New York, courts recognize assault as "an intentional placing of another person in fear of imminent harmful or offensive contact." Girden v. Sandals Int'l, 262 F.3d 195, 203 (S.D.N.Y. 2001) (quoting United Nat'l Ins. v. Waterfront N.Y. Realty Corp., 994 F.2d 105, 108 (2d Cir. 1993)). To plead assault, "the plaintiff must show that the defendant intended 'either to inflict personal injury or to arouse apprehension of harmful or offensive bodily contact.'" Bouveng v. NYG Cap. LLC, No. 14-cv-05474 (PGG), 2015 WL 3503947, at * 9 (S.D.N.Y. Jun. 2, 2015) (quoting Wahlstrom v. Metro-N. Commuter R.R. Co., 89 F. Supp. 2d 506, 528 (S.D.N.Y. 2000)).

Furthermore, New York defines battery as "an intentional wrongful physical contact with another person without consent." Girden, 262 F.3d at 203 (quoting United Nat'l Ins., 994 F.2d at 108). To plead battery, a plaintiff "must allege 'that there was bodily contact, that the contact was offensive, and that the defendant intended to make the contact without the plaintiff's consent." In re Lyman Good Dietary Supplements Litig., No. 17-cv-08047 (VEC), 2018 WL 3733949, at *5 (S.D.N.Y. Aug. 6, 2018) (quoting Bastein v. Sotto, 299 A.D.2d 432, 433 (2d Dep't 2002). Furthermore, the "intent required for battery is intent to cause a bodily contact that a reasonable person would find offensive." Id. (quoting Jeffreys v. Griffin, 1 N.Y.3d 34, 41 n.2 (2003)).

New York courts allow plaintiffs to recover under damages for intentional torts under an aiding and abetting theory of liability. To do so, a plaintiff "must allege knowledge of the alleged

tortious conduct by the aider and abettor, and substantial assistance by the aider and abettor in the achievement of the tortious conduct." Land v. Forgione, 177 A.D.3d 862, 864 (2d Dep't 2019) (citation omitted).

First, Freeman sufficiently alleged an underlying assault by claiming that the unknown man intentionally put Freeman in fear of imminent harmful or offensive contact by threatening to hurt Freeman if he tried to retrieve Saylor. Second, the unknown man also engaged in offensive bodily contact by grabbing Freeman and pressing a hard object against his side, which Freeman believed was a gun—a reasonable fear under the circumstances. Third, Freeman did not consent to the conduct. Finally, Freeman claims he was harmed and suffered severe emotional distress because of the assault and battery.

Freeman also alleged that either one or both Defendants knew of and substantially aided the unknown man in his assault and battery by hiring the man to restrain Freeman while Usdin stole Saylor. This inference is reasonable, as Jacobson allegedly threatened Freeman with bodily harm before the attack and Usdin participated in the dognapping with the unknown man during the assault. Freeman also alleges that Jacobson filed a false police report and hacked into Freeman's phone—deactivating it after the dognapping—to prevent him from seeking help, evidencing Jacobson's knowledge of the plan to assault and batter Freeman.

Accordingly, Freeman has pleaded sufficient facts to demonstrate that both Defendants aided and abetted the unknown man in both the assault and battery.

### 5. Claims Seven and Twelve – Intentional Infliction of Emotional Distress by Jacobson and Usdin

Lastly, Freeman asserts that Jacobson intentionally inflicted emotional distress ("IIED") against him by planning, directing, and paying Usdin to travel to California to assault him, steal

Saylor, and by filing a false police report against him in which Jacobson claimed to be Saylor's owner. Freeman also asserts an IIED claim against Usdin for his alleged involvement in the dognapping.

Under New York law, there are four elements for an IIED claim: "(i) extreme and outrageous conduct; (ii) intent to cause, or disregard of a substantial probability of causing, severe emotional distress; (iii) a causal connection between the conduct and the injury; and (iv) severe emotional distress." Pateman v. City of White Plains, No. 17-cv-06156 (KMK), 2020 WL 1497054, at *25 (S.D.N.Y. Mar. 25, 2020) (quoting Howell v. N.Y. Post Co., 612 N.E.2d 699, 702 (N.Y. 1993)). "Federal courts in the Second Circuit agree that 'no intentional infliction of emotional distress claim will lie where the conduct underlying the claim falls within the ambit of traditional tort liability.'" Garcia v. County of Westchester, No. 11-cv-07258 (KMK), 2017 WL 6375791, at *30 (S.D.N.Y. Dec. 12, 2017) (quoting Moore v. City of N.Y., 219 F. Supp. 2d 335, 339 (E.D.N.Y. 2002)).

First, a plaintiff "must demonstrate with particularity that the defendant's conduct was 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" Doe v. Doe, No. 16-cv-00332 (NSR), 2017 WL 3025885, at *4 (S.D.N.Y. July 14, 2017) (quoting Murphy v. Am. Home Prods. Corp., 58 N.Y.2d 293, 303 (1983)). Furthermore, where the defendant's conduct is part of a "continuous pattern of malicious behavior" or "will leave a lasting harm upon its victim" New York courts have found the conduct to be extreme and outrageous. Doe, 2017 WL 3025885, *5 (citing Halio v. Lurie, 15 A.D.2d 62, 66 (2d Dep't 1961)).

Freeman pleaded that the Defendants acted with intent and should have known their behavior would cause Freeman severe emotional distress, and that it in fact did cause him severe emotional distress. In addition, Freeman alleges that Jacobson repeatedly threatened to hurt him after Freeman took Saylor to California, and afterward Jacobson planned, directed, and paid for Usdin to travel across the country to steal Saylor. Usdin collaborated with the unknown man to attack Freeman and steal Saylor, while Jacobson hacked Freeman's phone and filed a false police report, preventing Freeman from seeking assistance. Although aspects of Freeman's claim fall within other realms of traditional tort liability, this elaborate plan—as pleaded—supports a finding of a "continuous pattern of malicious behavior" that may be considered "beyond all possible bounds of decency." See Baez v. JetBlue Airways, 745 F. Supp. 2d 214, 224 (E.D.N.Y. 2010) (noting that although "allegations of providing false information to the police . . . do not suffice for an IIED claim," such false reports may support a claim where, like here, there was "additional outrageous behavior"); see, e.g., Levine v. Gurney, 149 A.D.2d 473 (2d Dep't 1989) (filing of false police report may constitute outrageous conduct for purposes of IIED claim).

## CONCLUSION

Accordingly, the Court finds that Freeman has successfully pleaded each of his claims, and the Defendants' motion to dismiss is DENIED. The Clerk of the Court is respectfully requested to terminate the motion at ECF No. 31.

**SO ORDERED.**

SARAH NETBURN
United States Magistrate Judge

Dated: August 13, 2021
New York, New York

20